## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLORADO

Civil Action No. 09-cv-01750-REB-BNB

NORTHWEST DIRECT TELESERVICES, INC.,

     Plaintiff,

v.

TOUCHSTAR SOFTWARE CORPORATION,
KAYNE ANDERSON INVESTMENT MANAGEMENT, INC., and
ADAM MICHELIN,

     Defendants.

---

## SECOND AMENDED COMPLAINT AND JURY DEMAND

---

Plaintiff Northwest Direct Teleservices, Inc., for its Complaint and Jury Demand against Defendants TouchStar Software Corporation, Kayne Anderson Investment Management, Inc. and Adam Michelin, by and through its undersigned counsel, hereby states and alleges as follows:

### PARTIES

1.    Plaintiff Northwest Direct Teleservices, Inc. ("NDT") is an Oregon corporation with its principal place of business in Clackamas County, Oregon.

2.    Upon information and belief, Defendant TouchStar Software Corporation ("TouchStar") is a Delaware corporation with its principal place of business in Aurora, Colorado. TouchStar is the successor-in-interest to Data-Tel Info Solutions ("Data-Tel"), an Arizona company with its principal place of business in Mesa, Arizona. TouchStar



Exhibit A

sells and services its proprietary call center software and predictive dialers for inbound and outbound communications.

3.     Upon information and belief, Defendant Kayne Anderson Investment Management, Inc. ("Kayne") is a California corporation with its principal place of business in Los Angeles, California.  Kayne owns a controlling interest in TouchStar.

4.     Upon information and belief, Defendant Adam Michelin ("Michelin") is and, at all relevant times, has been the chief restructuring officer for TouchStar in Aurora, Colorado.  Michelin has been performing services for TouchStar in Colorado from approximately July 2008 until present.

## JURISDICTION AND VENUE

5.     This Court has jurisdiction in this case pursuant to 28 U.S.C. § 1332, on the grounds that the amount in controversy exceeds $75,000, exclusive of interest and costs, and the controversy is between citizens of different states.  For purposes of diversity, NDT is a citizen of Oregon, as its state of incorporation and its principal place of business are in Oregon.  Upon information and belief, Defendant TouchStar is a citizen of the State of Delaware as it is a Delaware corporation and a citizen of the State of Colorado as its principal place of business is in Aurora, Colorado.  Upon information and belief, Defendant Kayne is a citizen of the State of California, as its state of incorporation and its principal place of business are in California.  Upon information and belief, Defendant Michelin is a citizen of the State of Colorado.

6.     Venue is appropriate under 28 U.S.C. § 1391(a)(2) and (3).  Additionally, this action was transferred to this Court pursuant to an Opinion and Order issued by the

2

United States District Court for the District of Oregon in Case No. 09-cv-375-BR, in light of a forum selection clause set forth in the Agreement, as defined below, which is central to the claims set forth in this Complaint.

## GENERAL ALLEGATIONS

7.      NDT operates a telemarketing call center service, which means it provides inbound and outbound call center services to its clients. NDT owns two call centers, one in Beaverton, Oregon, and one in Iowa.

8.      On or around January 9, 2008, NDT purchased from Data-Tel a complete teleservices system to manage NDT's inbound and outbound call center traffic, including hardware, software, installation, and technical support. Data-Tel assured NDT that its system would enable NDT to centrally manage all of the data and call traffic of all of its call centers. NDT agreed to pay Data-Tel $250,000 on terms that required the final payment to be made upon NDT's satisfaction.

9.      NDT paid Data-Tel $152,500 toward the total purchase price.

10.     The Data-Tel system fell far short of Data-Tel's obligations under the agreement, and NDT was never satisfied with it. Data-Tel ultimately admitted that its system did not conform to the contract requirements and it was not robust or sophisticated enough to be customized to meet NDT's needs.

11.     As a result of the underperformance of the system and the associated delays and system shut-downs, NDT lost business and suffered contractual penalties with its customers. NDT demanded that Data-Tel meet its contractual obligations and

3

pay NDT's damages that resulted from Data-Tel's failure to perform under the agreement.

12.     In the midst of negotiations over the dispute, TouchStar acquired Data-Tel and assumed Data-Tel's contractual relationship with NDT.

13.     Rather than lose NDT as a customer, TouchStar attempted to persuade NDT to migrate to a TouchStar system, which TouchStar claimed met all of NDT's requirements. In reliance on TouchStar's representations, NDT agreed to move to the TouchStar platform and the parties entered into the "TouchStar Software Corporation Hardware Sales Agreement and End-User License" (the "Agreement"). (A true and correct copy of the Agreement is attached hereto as **Exhibit 1**.)

14.     Pursuant to the terms of the Agreement, NDT supplemented its initial $152,500 payment (made to Data-Tel) with an additional payment of $40,000 and agreed to pay TouchStar an additional $47,500 upon acceptance of the system.

15.     Under the Agreement, NDT relinquished its Data-Tel licenses, which it had a right to resell at will, in exchange for licenses from TouchStar, which may not be resold. In addition, NDT committed to a three-year maintenance/service agreement that required NDT to continue to make periodic payments for ongoing technical support after the first 18 months following acceptance of the installation. NDT has given TouchStar written notice that it has not accepted the TouchStar platform and has not accepted the installation of the software.

16.     TouchStar delivered its system five months after depositing NDT's $40,000 payment. The TouchStar system failed to perform as promised from the

4

moment it was installed. For example, NDT's contracts with inbound call customers require NDT to answer 80% of incoming calls within 20 seconds. Calls that drop after 20 seconds are referred to as "dropped calls" and NDT generally must have less than 3% drops. Upon deployment, the TouchStar platform dropped so many calls that NDT was forced to over-staff to meet its service levels. Further, the TouchStar system frequently left calls in queue permanently rather than transferring them to the next available agent.

17.     Under the Agreement, TouchStar correspondingly agreed to provide to NDT software, hardware, licensing, installation, and technical support. At the center of the system was what TouchStar described as the "Cadillac" of system servers, its "Enterprise Server," which would centrally support and manage up to 192 agent call stations and 20 administrative stations at multiple call center locations from NDT's hub center in Beaverton, Oregon.

18.     In entering the Agreement, NDT relied on TouchStar and Kayne's stated and publicly reported attributes of its Enterprise Server system. NDT compromised its claims and even agreed to pay additional money because the Enterprise Server system reportedly had all the "bells and whistles" that would allow NDT to offer more services to its clients and to grow the business without requiring substantial upgrades to its infrastructure. At the time of the Agreement, TouchStar and Kayne had a thorough understanding of NDT's operational structure and needs.

19.     During all times relevant herein, Kayne was the primary equity holder of TouchStar and had the right and ability to control the operations of TouchStar. Kayne

5

also loaned money to TouchStar, but has not sufficiently capitalized TouchStar. As part of Kayne's acquisition of TouchStar, Kayne was to fund TouchStar's completion of a number of software development projects by infusing the necessary capital to do so.

20.    In February 2008, Kayne directed TouchStar's marketing release of its new Enterprise server platform as well as other modules. In or around July of 2008, Kayne terminated a number of TouchStar's operating officers and appointed a Chief Reorganization Officer, Adam Michelin, who currently runs TouchStar on a day to day basis. In the last two years, Kayne has directed TouchStar's inaccurate public and private representations regarding the performance abilities of the TouchStar platform NDT purchased.

21.    Kayne directed these inaccurate representations to induce NDT into long-term contracts that Kayne and TouchStar have no interest in satisfying. Once Michelin was installed as TouchStar's Chief Reorganization Officer, he continued to misrepresent the capabilities of the Enterprise Server system, by, among other things, claiming that the server was in the final stages of Beta testing, promising to deliver a quality assurance ("QA") module and a blind monitoring module per the terms of the Agreement and flaunting the viability of the Enterprise Server and corresponding software as suitable for NDT's operations. In so doing, Kayne, TouchStar, and Michelin participated in defrauding NDT and have continued to do so through today.

22.    These misrepresentations not only induced NDT to enter into the Agreement but caused NDT to prolong its relationship with TouchStar and forego seeking other vendors.

23.     TouchStar also failed to deliver the Enterprise Server. Rather than deliver a single, high-capacity Enterprise Server, TouchStar provided NDT with two lower-capacity servers. As a result, NDT was forced to split its 192 agent licenses between the two servers, which in turn rendered approximately 24 of the licenses unusable. TouchStar ultimately admitted to NDT that its Enterprise Server had failed in Beta testing, although it continued to advertise the server on its website.

24.     In addition to not delivering the Enterprise Server, TouchStar has failed and refused to deliver a QA module and a blind monitoring module. TouchStar has similarly failed to deliver reports that were required by the Agreement, or to fix its standard reports to accurately separate inbound and outbound results in blended campaigns. These items are basic and elementary expectations of the TouchStar platform, and are critical to NDT's operations.

25.     Despite repeated demands and requests from NDT, TouchStar has not provided alternative vendors who might be able to deliver a compatible platform QA and blind monitoring modules. Nor has TouchStar delivered to NDT the Enterprise Server or other promised improvements to the Enterprise platform (such as screen capture). NDT has separately generated the required client reports that TouchStar was contracted to provide by hiring temporary programmers and consultants at a cost to NDT of no less than $15,000.

26.     As delivered, the TouchStar platform was not stable. Industry expectations are that an inbound system will remain up and running 99.99% of the time. The platform TouchStar delivered to NDT failed on a weekly basis, requiring NDT to

7

reboot the system in its entirety during operations. Each reboot caused all calls in queue to be lost, which negatively impacted NDT's ability to meet its "service level" commitments to its customers. To respond to customer complaints related to the instability of the system, NDT ultimately contracted with third parties to provide the long-term fix TouchStar was unwilling or unable to provide.

27.      Despite the aforementioned problems, NDT had no choice other than to deploy and continue to use the TouchStar system. The prior system provided by Data-Tel was even less reliable than the TouchStar platform and replacing the TouchStar system entirely would have cost NDT between $250,000 and $350,000 and jeopardized its ability to meet its obligations to its customers. (Even if NDT was inclined to replace the TouchStar system, it had invested $192,500 in buying the Data-Tel and TouchStar systems and had spent tens of thousands of dollars more stabilizing the TouchStar platform.) As a result, NDT did not have the cash available for another large-scale purchase. However, although it continued to use the TouchStar system out of necessity, NDT refused to make any additional payments to TouchStar until its concerns were resolved.

28.      As part of the Agreement, in addition to a license to use the TouchStar platform, generally, TouchStar functions with "seat licenses" for each operator at the Oregon call center who would be making or receiving calls.

29.      The TouchStar system is designed so that TouchStar can disable operator stations remotely by virtue of "turning off" individual seat licenses. Despite the fact that

this action had been commenced, TouchStar threatened to exercise its limited right under section 2(c) of the Agreement to disable 48 seat licenses.

30.  Further, TouchStar, while under the control of Kayne and Michelin, threatened to maximize the negative impact of the loss of seat licenses by employing an algorithm that would randomly disable various seat licenses on a rotating basis. Even when NDT offered to comply with section 2(c) by returning permanently 48 of its seat licenses, TouchStar refused to provide NDT with assurances it would not use its algorithm to disable rotating seat licenses.

31.  On multiple occasions, TouchStar, under the control of Kayne and Michelin, temporarily disabled entire servers by setting the governing broadcaster license to expire. The broadcaster license covers each of the two servers delivered by TouchStar to NDT.

32.  At the time TouchStar first provided the servers to NDT, the broadcaster license was set to expire on a date certain despite the fact that nothing in the Agreement referred to the broadcaster license as "temporary" or gave TouchStar the right to provide a broadcaster license that had an expiration date. NDT and TouchStar affirmatively eliminated a termination provision and the existence of a termination provision was specifically precluded.

33.  The inclusion of the expiration date was not innocent; TouchStar, Kayne and Michelin relied on the imminent expiration of the broadcaster license as incentive to try and force NDT to concede to its payment demands. Michelin, among others at

4828-0588-8517.3

TouchStar, knew that TouchStar had no contractual right to have a broadcaster license in NDT's system.

34.    In August 2009, in an effort to interfere with the Agreement, Michelin and Silicon Valley Bank ("SVB"), TouchStar's senior creditor, caused TouchStar to take the additional step of disabling NDT's entire platform.   According to NDT's computer records, a TouchStar employee illegally bypassed NDT's firewall and trespassed into NDT's servers, entering the NDT network through a hidden "backdoor." Once inside the NDT system, the TouchStar employee deleted TouchStar-related and non-TouchStar-related programs from servers owned by NDT.

35.    As a result, all of NDT's servers were disabled and the TouchStar system deployed at NDT's Oregon call center abruptly ceased functioning.

36.    TouchStar also destroyed digital recordings, call history files and other key data owned by NDT.

37.    By allowing and directing TouchStar to cause the NDT System to expire and to be deactivated, Michelin and SVB intentionally and improperly interfered with (a) the Agreement, which prohibits TouchStar from deactivating the NDT System; and (b) NDT's ability to service its clients and take on additional work through NDT's call centers.

38.    TouchStar also communicated with certain third-parties that considered working with NDT and acknowledged responsibility for the damage done to the servers and threatened legal action against any party that assisted NDT in correcting the problems.

10

## FIRST CLAIM FOR RELIEF
### (Breach of contract-Against TouchStar)

39.    NDT incorporates the allegations of paragraphs 1 through 38, inclusive, as if fully set forth herein.

40.    The Agreement is a valid, binding and enforceable agreement between NDT and TouchStar.

41.    NDT has fully performed its duties and obligations under the Agreement.

42.    TouchStar has breached the Agreement by, among other things:

a.    failing to deliver an Enterprise Server capable of providing centralized management of NDT's call center activities;

b.    failing to provide any form of stable platform that does not crash with regularity, and, in the event of a crash, can be repaired and restarted quickly;

c.    failing to deliver and install a QA module;

d.    failing to deliver and install a blind monitoring module;

e.    failing to provide standard report programs that accurately separates inbound and outbound results in blended campaigns;

f.    failing to provide adequate and timely technical support;

g.    threatening to revoke licenses that would irreparably cripple NDT; and

h.    disabling NDT servers.

11

43.     As a direct result of TouchStar's breach, NDT is entitled to a full refund of all payments and credits, amounting to not less than $432,000 pursuant to the terms of the Agreement.

44.     In the alternative, the purported exclusive remedy in the Agreement fails for its essential purpose.  In addition, TouchStar's conduct was in bad faith because it represents evasion of the spirit of the bargain, lack of diligence, willful rendering of imperfect performance, and/or interference with or failure to cooperate in NDT's performance.

45.     As a result, the exclusive remedy provision of the Agreement is unenforceable, and NDT is entitled to consequential damages of an amount to be proved at trial.

## SECOND CLAIM FOR RELIEF
### (Intentional Misrepresentation-Against TouchStar, Kayne and Michelin)

46.     NDT incorporates the allegations of paragraphs 1 through 45, inclusive, as if fully set forth herein.

47.     TouchStar, Kayne and Michelin made the following intentional misrepresentations, among others, to NDT:

      a.     that TouchStar had a suitable Enterprise Server and corresponding software that could run NDT's call centers from a single server;

      b.     that TouchStar could provide a QA module that would produce suitable reports and manage data to meet NDT's needs;

12

c.  that TouchStar could provide a blind monitoring module that would allow NDT's customers to monitor calls in "real time";

d.  that TouchStar had a technical support team that could respond promptly and effectively to any problems that might arise;

e.  that TouchStar would generate 11 key management reports that NDT could use as templates to build out future reports;

f.  that the server was in the final stages of Beta testing; and

g.  that TouchStar's platform was proven to be stable and effective.

48.  The foregoing representations were knowingly false at the time they were made, TouchStar, Kayne and Michelin knew that TouchStar could not and would not perform one or more of its obligations under the Agreement.

49.  NDT reasonably relied on the representations by, among other things, entering into the Agreement, relinquishing its claims against Data-Tel, by continuing to utilize the TouchStar system and by not seeking alternative system support.

50.  As a direct and proximate cause of TouchStar, Kayne and Michelin's knowing and intentional misrepresentations, NDT has been damaged as a result of the misrepresentations, including, without limitation, lost customers, contract penalties, and stunted growth, in an amount to be proved at trial.

### THIRD CLAIM FOR RELIEF
#### (Negligent Misrepresentation-Against TouchStar, Kayne and Michelin)

51.  NDT incorporates the allegations of paragraphs 1 through 50, inclusive, as if fully set forth herein.

4828-0588-8517.3

52.     TouchStar, Kayne and Michelin made the following negligent misrepresentations, among others, to NDT:

a.      that TouchStar had a suitable Enterprise Server and corresponding software that could run NDT's call centers from a single server;

b.      that TouchStar could provide a QA module that would produce suitable reports and allow NDT to agent evaluations meeting NDT's client requirements;

c.      that TouchStar could provide a blind monitoring module that would allow NDT's customers to monitor calls in "real time" and without supervision;

d.      that TouchStar had a technical support team that could respond promptly and effectively to any problems that might arise;

e.      TouchStar would generate 11 key management reports that NDT could use as templates to build out future reports;

f.      claiming that the server was in the final stages of Beta testing; and

g.      that TouchStar's platform was proven to be stable and effective that.

53.     TouchStar, Kayne and Michelin acted negligently in making these representations.

54.     NDT reasonably relied on the representations by, among other things, entering into the Agreement, relinquishing its claims against Data-Tel, by continuing its relationship with TouchStar and by not seeking alternative system support.

14

55.     As a direct and proximate cause of TouchStar, Kayne, Michelin negligent misrepresentations, NDT has been damaged as a result of the misrepresentations, including, without limitation, lost customers, contract penalties, and stunted growth, in an amount to be proved at trial.

## FOURTH CLAIM FOR RELIEF
### (Tortious Interference with Prospective Business Advantage-Against Michelin and Kayne)

56.     NDT incorporates by reference the allegations contained in paragraphs 1 through 55 as if fully set forth herein.

57.     NDT has established business relationships with numerous clients for whom it provides inbound and outbound call center services.

58.     Michelin and Kayne were aware of those business relationships between NDT and its clients.

59.     Michelin intentionally and improperly interfered with NDT's prospective business advantage by, among other things, temporarily disabling entire servers by allowing the NDT system to expire, causing the NDT system to be deactivated and preventing the NDT system from being restored.

60.     Kayne intentionally and improperly interfered with NDT's prospective business advantage by, among other things, temporarily disabling entire servers by allowing the NDT system to expire.

61.     NDT has suffered and will continue to suffer damage or loss, as a direct and proximate result of Michelin and Kayne's intentional and improper interference.

4828-0588-8517.3

### FIFTH CLAIM FOR RELIEF
### (Tortious Interference with Contractual Obligations-
### Against Michelin and Kayne)

62.     NDT incorporates by reference the allegations contained in paragraphs 1 through 61 as if fully set forth herein.

63.     NDT is a party to the Agreement.

64.     In the course of Michelin's employment with TouchStar, Michelin has been made aware of the Agreement.

65.     As the controlling shareholder of TouchStar, Kayne has been made aware of the Agreement.

66.     Michelin tortiously interfered with the Agreement by, among other things, causing and/or encouraging TouchStar to breach the Agreement by temporarily disabling entire servers by allowing the NDT system to expire, causing the NDT system to be deactivated, and preventing restoration of the NDT system.

67.     Kayne tortiously interfered with the Agreement by, among other things, causing and/or encouraging TouchStar to breach the Agreement by temporarily disabling entire servers by allowing the NDT system to expire.

68.     NDT has suffered and will continue to suffer damage or loss, as a direct and proximate result of Kayne and Michelin's intentional and improper interference with the Agreement.

### SIXTH CLAIM FOR RELIEF
### (Civil Conspiracy-Against Michelin and Kayne)

69.     NDT incorporates the allegations of paragraphs 1 through 68, inclusive, as if fully set forth herein.

16

70.     Defendants Michelin and Kayne, among others, agreed through their words or conduct to accomplish an unlawful goal by, among other things, continuing to misrepresent that TouchStar had a suitable Enterprise Server and corresponding software that could run NDT's call centers from a single server and interfering with the Agreement by temporarily disabling entire servers by allowing the NDT system to expire.

71.     Defendants Michelin and Kayne, among others, engaged in one or more unlawful acts, including, without limitation, misrepresenting that TouchStar had a suitable Enterprise Server and corresponding software that could run NDT's call centers from a single server and interfering with the Agreement by temporarily disabling entire servers by allowing the NDT system to expire.

72.     Defendant Michelin and SVB, among others, agreed through their words or conduct to accomplish an unlawful goal by, among other things, causing and/or encouraging TouchStar to breach the Agreement by temporarily disabling entire servers by allowing the NDT system to expire, causing the NDT system to be deactivated, and preventing restoration of the NDT system.

73.     Defendant Michelin and SVB engaged in one or more unlawful acts, including, without limitation, causing and/or encouraging TouchStar to breach the Agreement by temporarily disabling entire servers by allowing the NDT system to expire, causing the NDT system to be deactivated, and preventing restoration of the NDT system

17

74.     As a direct and proximate result of the unlawful acts of Defendants Michelin and Kayne, NDT has been damaged in an amount to be proved at trial.

WHEREFORE, Plaintiff Northwest Direct Teleservices, Inc. prays for judgment in its favor as follows:

a.     On its First Claim for Relief, against TouchStar: (a) an award of damages in an amount to be proved at trial as a result of TouchStar's breach of the Agreement; (b) prejudgment and post judgment interest; and (c) an award of attorneys' fees and costs incurred in this action;

b.     On its Second Claim for Relief, against TouchStar, Kayne and Michelin: (a) an award of damages in an amount to be proved at trial as a result of TouchStar, Kayne and Michelin's intentional misrepresentations; (b) prejudgment and post judgment interest; and (c) an award of attorneys' fees and costs incurred in this action;

c.     On its Third Claim for Relief, against TouchStar, Michelin and Kayne: (a) an award of damages in an amount to be proved at trial as a result of TouchStar, Michelin and Kayne's negligent misrepresentations; (b) prejudgment and post judgment interest; and (c) an award of attorneys' fees and costs incurred in this action;

d.     On its Fourth Claim for Relief against Michelin and Kayne: (a) an award of damages in an amount to be proved at trial as a result of Michelin and Kayne's tortiuous interference with prospective business advantage; (b) prejudgment and post judgment interest; and (c) an award of attorneys' fees and costs incurred in this action;

e.     On its Fifth Claim for Relief against Michelin and Kayne: (a) an award of damages in an amount to be proved at trial as a result of Michelin and Kayne's tortiuous

18

interference with contractual obligations; (b) prejudgment and post judgment interest; and (c) an award of attorney's fees and costs incurred in this action;

f.      On its Sixth Claim for Relief against Michelin: (a) an award of damages in an amount to be proved at trial as a result of Michelin and Kayne's civil conspiracy; (b) prejudgment and post judgment interest; and (c) an award of attorneys' fees and costs incurred in this action; and

g.      Any other and further relief the Court deems just and proper under the circumstances.

DATED this 30th day of October, 2009.

KUTAK ROCK LLP

By: *s/ Neil L. Arney*
　　　Neil L. Arney
　　　1801 California Street, Suite 3100
　　　Denver, CO  80202-2626
　　　Tele:  (303) 297-2400
　　　Fax:  (303) 292-7799
　　　Email:  neil.arney@kutakrock.com

ATTORNEYS FOR PLAINTIFF
NORTHWEST DIRECT
TELESERVICES, INC.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 30th day of October, 2009 I electronically filed and served the foregoing pleading on the clerk of court using the CM/ECF system which will send notification of such filing to the following e-mail address:

Attorneys for Kayne Anderson Investment Management, Inc.:

Gillian Dale
John Edwin Bolmer, II
Hall & Evans, LLC – Denver
1125 17th Street
Suite 600
Denver, CO 80202
daleg@hallevans.com
bolmerj@hallevans.com

Attorneys for Receiver, Eric N. Grothe:

Douglas Wayne Brown
Marie E. Drake
Brown, Berardini & Dunning, P.C.
2000 South Colorado Blvd.
Tower Two
Suite 700
Denver, CO 80222
dbrown@bbdfirm.com
mdrake@bbdfirm.com

By:     *s/ Edna M. Slagle*
        Edna M. Slagle